IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
_____ DIVISION

FILED 1/21/2009 14:12:40
Pat O'Brien Pulaski Circuit Clerk
CR6 By _____ 

e360INSIGHT, LLC                                                                PLAINTIFF

VS.                              NO. CV-2009-465-1

CHOICEPOINT PRECISION MARKETING, LLC                        DEFENDANT

### COMPLAINT

Plaintiff, e360Insight, LLC ("e360"), for its Complaint against Defendant, ChoicePoint Precision Marketing, LLC ("ChoicePoint"), states:

### I. PARTIES, JURISDICTION, AND VENUE.

1. e360 is an Illinois corporation that had its principal office at 500 Sumac Rd., Highland Park, IL 60035.

2. ChoicePoint is a Georgia limited liability company with one of its principal offices at 1000 Alderman Drive, Alpharetta, GA 30005, and it may be served by delivering process to Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Spring Street, Little Rock, AR 72201. ChoicePoint was formerly a corporation but converted into a limited liability company.

3. This is an action for breach of contract. This Court has jurisdiction of the parties and subject matter pursuant to Ark. Code Ann. § 16-13-201. Venue is proper in this Court pursuant to the forum selection clause contained in the Data License Agreement, which is attached hereto as Exhibit A and incorporated herein.

1

## II. FACTS.

4. On or about May 28, 2003, ChoicePoint and e360 entered into a Data License Agreement (the "Agreement," a copy of which is attached hereto as Exhibit A and incorporated herein). Under the Agreement, ChoicePoint granted to e360 a license to use data from ChoicePoint's database composed of names, addresses and email addresses of people who opted to receive third party commercial advertising messages (sometimes, the "Data") for purpose of transmitting email campaigns for e360's customers. See Ex. A.

5. In addition, under the Agreement, the parties expressly and unambiguously agreed "to indemnify and hold the other party harmless from and against all direct costs, losses, damages, liabilities and expenses, including reasonable attorneys' fees, attributable to <u>any claim</u> made by a third party <u>arising</u> out of either party's breach of any of the representations or warranties provided herein[.]" Ex. A, ¶ 14(a) (emphasis added).

6. Further, under the Agreement, ChoicePoint warranted that the Data it sold to e360 was from "records of persons who have opted to receive third party commercial email advertising messages[.]" Ex. A, ¶ 12(a)(iii). Moreover, ChoicePoint warranted that "the execution, delivery and performance by CP of this Agreement will not violate any law, statute or other governmental regulation[.]" Agreement, ¶ 12(a)(ii).

7. Sometime thereafter, e360 used the Data to transmit email campaigns for e360's customers. After these email campaigns began, e360 was sued by John Ferron in the Court of Common Pleas of Franklin County, Ohio, Case No. 07 CVH 09 12775, and Mr. Silverstein in the U.S. District Court, Central District of California, Case No. 07 2835 CAS (VBKx). Mr. Ferguson drafted a complaint for filing in Washington Court. The matter was settled before

2

Ferguson filed the complaint. These three (3) complainants alleged, *inter alia*, that they never consented to receive third-party email messages.

8. So, when ChoicePoint provided these persons' information to e360, ChoicePoint violated ¶ 12(a)(iii) of the Agreement. Had ChoicePoint refrained from breaching this part of the Agreement, e360 would have never received the complainants' email addresses. As such, no email would have been sent to these complainants, and their lawsuits would have never been filed. Thus, but for ChoicePoint's breach of the Agreement and negligence, e360 would have never been sued in the first place.

9. In her September 10, 2008, letter, Ms. Meredith Sidewater on behalf of ChoicePoint declined to indemnify e360 for the expenses and damages incurred by e360 in the three (3) disputes. See Letter attached hereto as Exhibit B. She claimed four (4) of the six (6) emails at issue in the disputes were "Optin Status of O," which she contended means that the records were approved only for direct mail and not email.

10. If Ms. Sidewater's assertion is true, this assertion constitutes an admission of violation of the CAN-SPAM Act of 2003, which provides that if a recipient requests not to receive commercial email, then it is unlawful for the sender to release, sell, or transfer such person's email address to a third party. Thus, ChoicePoint admits that it breached ¶ 12(a)(ii) of the Agreement. But for this breach, e360 would not have sent any emails to the complainants and would not have been sued.

11. Moreover, the Agreement does not contain any provision providing that records marked as "O" are for direct mail only and not email. To the contrary, the Agreement expressly provides that ChoicePoint warranted that the Data provided to e360 was from "records of persons who have opted to receive third party commercial email advertising messages[.]" Ex. A,

3

¶ 12(a)(iii) (emphasis added). So, ChoicePoint was obligated to provide email addresses under the Agreement, not direct "snail" mail addresses.

12. As a result of ChoicePoint's breach of the Agreement, e360 has incurred legal expenses and paid for settlements in three (3) matters in the total sum of at least $352,743.00. All three (3) matters have been settled at this time.

### III. CAUSE OF ACTION.

#### Breach of Contract.

13. e360 realleges and incorporates herein all preceding allegations and exhibits in and to this Complaint.

14. ChoicePoint and e360 entered into a contract, the Agreement, that required ChoicePoint to provide to e360 Data from "records of persons who have opted to receive third party commercial email advertising messages[.]" Ex. A, ¶ 12(a)(iii).

15. In addition, the Agreement requires ChoicePoint "to indemnify and hold the other party harmless from and against all direct costs, losses, damages, liabilities and expenses, including reasonable attorneys' fees, attributable to <u>any claim</u> made by a third party <u>arising</u> out of either party's breach of any of the representations or warranties provided herein[.]" Ex. A, ¶ 14(a) (emphasis added).

16. ChoicePoint failed to provide e360 Data from records of persons who had opted to receive third party commercial email advertising messages. In addition, ChoicePoint failed to indemnify and hold e360 harmless from and against all direct costs, losses, damages, liabilities and expenses, including reasonable attorneys' fees, attributable to the claims arising out of ChoicePoint's breach of any of the representations or warranties provided in the Agreement.

17. e360 did what the Agreement required or was excused from performance by ChoicePoint's first breach of the Agreement. As a result of ChoicePoint's breach of the Agreement, e360 has incurred legal expenses and paid for settlements in three (3) matters in the total sum of at least $352,743.00, plus pre- and post-judgment interest accruing at the highest legal rate and attorney's fees and expenses, pursuant to the terms of the Agreement and Ark. Code Ann. § 16-22-308.

WHEREFORE, Plaintiff, e360Insight, LLC, prays for judgment against Defendant, ChoicePoint Precision Marketing, LLC, in the sum of at least $352,743.00, plus pre-judgment interest accruing at the highest legal rate, plus attorney's fees and expenses, pursuant to the terms of the Agreement and Ark. Code Ann. § 16-22-308, with the total accruing post-judgment interest at the highest legal rate, and for all other just and proper relief to which e360Insight, LLC is entitled.

Respectfully submitted,

NISWANGER LAW FIRM PLC
#5 Innwood Circle, Suite 110
Little Rock, AR 72211
Phone (501) 223-2888
Fax (501) 421-3651
www.niswangerlawfirm.com

By: [signature]
Stephen B. Niswanger, #96012
Alexander Cale Block, #2007149

*Attorneys for e360Insight, LLC*

## DATA LICENSE AGREEMENT

This Data License Agreement ("Agreement") is dated as of this 28th day of May, 2003 ("Effective Date") by and between ChoicePoint Precision Marketing, Inc., a Georgia corporation, with offices located at 3801 Woodland Heights Road, Suite 200, Little Rock, AR 72212 ("CP"), and e360Insight, LLC, an Illinois corporation, with a principal office located at 500 Sumac Road, Highland Park, IL 60035 ("Licensee"). All entities previously identified in this paragraph shall be collectively referred to hereinafter as the "parties."

WHEREAS, CP compiles, owns and maintains a proprietary computerized database composed of names, physical addresses and email addresses of persons who have opted to receive third party commercial advertising messages (the "Database"); and

WHEREAS, Licensee desires to license a portion of the Database (the "Data") upon the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the premises set forth above and the mutual promises, agreements and conditions stated herein, the parties agree as follows:

1. <u>License</u>. CP hereby grants and Licensee hereby accepts a non-exclusive license to use the Data (which is fully described in Exhibit A) in accordance with the terms and conditions hereof.

2. <u>Term</u>. The initial term ("Initial Term") of the Agreement shall be one (1) year and shall commence on the Effective Date.

3. <u>Termination</u>. (a) Either party may terminate the Agreement immediately in the event the other party is in material default hereunder and fails to cure such material default within thirty (30) days of written notice from the other party specifying the nature of such material default. Notwithstanding the foregoing, either party may terminate this Agreement for any reason by providing not less than thirty (30) days prior written notice to the other party.

(b) Upon termination of this Agreement, the following shall occur:

(i) CP shall cease to provide the Data to Licensee;

(ii) Licensee shall pay CP for all sums, if any, due hereunder, pursuant to the payment terms defined in Exhibit A.; and

(iii) Unless otherwise provided herein, Licensee shall promptly destroy all documentation, materials, or other information evidencing the Data, together with a written certification that all of the Data has been destroyed.

4. <u>Delivery of the Data</u>. CP shall deliver the Data to Licensee on the type of media, in the format, on the delivery date and containing those data elements specified in Exhibit A.

5. <u>Restrictions Upon Use of Data</u>. Licensee hereby agrees that it will hold and use the Data strictly in accordance with the following conditions, unless otherwise agreed in writing:

(a) The Data may be received, held and possessed by Licensee at Licensee's business address listed above, only, or at a third-party service vendor, solely for the purpose of transmitting the

**EXHIBIT A**

email campaigns permitted hereunder, provided such vendor is (a) contractually bound and limited by terms at least as restrictive as those set forth herein pursuant to a third-party service agreement in a form approved or provided by CP (which approval shall not be unreasonably withheld), and (b) the use of such third-party has been approved in advance by CP (which approval shall not be unreasonably withheld). Except as otherwise provided herein, the transfer or conveyance of the Data to any third party is expressly prohibited.

(b)   Licensee shall not use the Data as part of any CD-ROM product or resell the Data or technology in any way except as provided in this Agreement.

(c)   The Data is licensed only to Licensee, and Licensee shall not knowingly allow its customers to resell or distribute the Data, or any subset thereof.

(d)   Licensee will not, nor will it knowingly allow its customers to use the Data to create any interactive on-line, CD-ROM, or other derivative product. Licensee will establish reasonable precautions to prevent such unauthorized use; provided, however, Licensee shall not be in breach of this Agreement if it promptly notifies CP in writing of any unauthorized use of which it becomes aware and reasonably cooperates with CP to prevent any further unauthorized use.

(e)   Licensee shall not publicly display the Data on the Internet. Licensee may use the Internet as a means by which to transfer the Data to its customers.

6.   **Permitted Uses of Data.** The Data shall only be used by Licensee in the ways set forth in Exhibit A, unless otherwise agreed in writing.

7.   **License Fees.** Licensee agrees to pay license fees ("License Fees") to CP for the use of the Data in accordance with the terms set forth in Exhibit A.

8.   **Right to Audit.** Licensee agrees that at all times it shall maintain current, accurate and complete books and records relating to its usage of the Data and any payments due CP derived therefrom. Licensee agrees that CP, or any designee of CP, shall have the right following the Effective Date of this Agreement to examine, inspect, audit, review and copy or make extracts from all such books, records and any source documents used in the preparation thereof during normal business hours upon written notice to Licensee at least ten (10) business days prior to the commencement of any such examination, inspection, review or audit. Such audit shall be strictly limited to those books and records, which specifically relate to information pertinent to the use of the Data.

9.   **Title to Data.** The parties expressly acknowledge and agree that title to the Data shall at all times remain exclusively in CP; provided that once Licensee's customer receives a response, confirmation, or transaction from an individual who has been contacted by such customer pursuant to such customer's use of the Data (a "Response"), no restrictions contained herein concerning that person's record shall apply.

10.   **Confidentiality.** The parties agree that the terms and conditions of this Agreement, including all Exhibits hereto, and any policies, business practices, plans and methods not in the public domain which may be known or disclosed by either party to the other as a result of this Agreement will be held in confidence and not disclosed to any third party for any reason unless required by law.

11.   **Injunctive Relief.** Licensee hereby acknowledges that the Data has been developed and created at great time and expense and that CP has a proprietary interest therein. Licensee further

acknowledges that CP may suffer great harm if Licensee misappropriates the Data. Accordingly, Licensee agrees to take reasonable precautions to prevent the misuse of the Data. Either party may seek injunctive or other equitable relief against the breach or threatened breach of this Section in addition to any other legal remedies which may be available.

12. <u>Warranties</u>.

(a) CP warrants that (i) it has full power and authority to enter into this Agreement; (ii) the execution, delivery and performance by CP of this Agreement will not violate any law, statute or other governmental regulation, (iii) the Data consists of records of persons who have opted to receive third party commercial email advertising messages; (iv) the Data will not violate the proprietary or intellectual property rights of any third parties; (v) the Data does not violate any of CP's privacy policies or privacy policies of its data suppliers; and (vi) the Data will be as current, accurate and complete as possible using the source data, compilation and data processing methods normally employed by CP in the ordinary course of its business; provided, however, there is no warranty that the Data is error-free.

(b) Licensee represents and warrants to CP that (i) it has full power and authority to enter into this Agreement; (ii) the execution, delivery and performance by Licensee of this Agreement will not violate any law, statute or other governmental regulation; (iii) Licensee's use of the Data will comply with all privacy, data protection, credit, and any other laws, statutes and governmental regulations applicable to such use of the Data, including without limitation the Fair Credit Reporting Act and the Children's Online Privacy Protection Act; (iv) the advertisements (the "Advertisements") delivered to the Data hereunder will not violate the proprietary or intellectual property rights of any third parties; and (v) the Advertisements shall not contain any content or material which is discriminatory, profane or obscene, or which is illegal in the United States.

(c) EXCEPT AS SET FORTH IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

13. <u>Remedies</u>. CP's sole obligation and Licensee's sole remedy under the limited warranties set forth in Section 12(a) above relating to the Data being current, accurate and complete is strictly and exclusively limited to the prompt (but in no event longer than thirty (30) days after receipt of Licensee's notice) correction of any errors in the Data which are made known to CP by written notice from Licensee describing such errors.

14. <u>Third-Party Indemnity</u>.

(a) Both parties agree to indemnify and hold the other party harmless from and against all direct costs, losses, damages, liabilities and expenses, including reasonable attorneys' fees, attributable to any claim made by a third party arising out of either party's breach of any of the representations or warranties provided herein, or either party's failure to perform any of its obligations under this Agreement, provided that (i) both parties give prompt written notice of any such claim of which the parties have knowledge; and (ii) names party is given full control over the defense of such claim and receives the full cooperation of the other party in the defense thereof.

15. <u>Limitation of Liability</u>. NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO, LOST BUSINESS AND LOST PROFITS, WHETHER BASED IN CONTRACT, TORT

OR ANY OTHER THEORY. Any cause of action arising from or in connection with this Agreement shall be asserted within one (1) year of the date upon which such cause of action accrued, or the date upon which the complaining party should have reasonably discovered the existence of such cause of action, whichever is later. With the exception of the indemnity provisions set forth in paragraph 14, the aggregate liability of the parties to one another shall not exceed the amount of fees paid or payable by Licensee to CP hereunder.

16. Publicity. No media releases will be issued by either party, relating to this Agreement, without the prior written approval of the other.

17. Applicable Law and Venue. The parties agree that any dispute, controversy or claim arising under or in connections with this Agreement or the relationship between the parties shall be decided exclusively by and in the state or federal district court of competent jurisdiction located in Little Rock, Arkansas applying the laws of such state without regard to conflicts of law principles. The parties agree to submit to the jurisdiction of such courts.

18. Entire Agreement. This Agreement, together with the Exhibit(s) attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all written or oral prior agreements and understandings between the parties.

19. Modification / Severance / Waiver. The Agreement, and any of the Exhibit(s) attached hereto, may only be amended by a separate writing signed by both parties. If any one or more of the provisions of the Agreement shall for any reason be held to be invalid, illegal or unenforceable, the same shall not affect any of the other portions of the Agreement. Failure or delay by either party in exercising any right hereunder shall not operate as a waiver of such right.

20. Assignment/Change of Control. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement may not be assigned by a party without the express written consent of the other and any purported assignment, unless so consented to, shall be void and without effect. Notwithstanding the foregoing, either party, without the prior written approval of the other party, may assign its rights and obligations hereunder to a successor in ownership in connection with any merger, consolidation, or sale of substantially all of the assets of the business of a party, or any other transaction in which ownership of more than fifty percent (50%) of the party's voting securities is transferred.

21. Force Majeure. Neither party shall be liable for any losses arising out of the delay or interruption of its performance of obligations under the Agreement due to any act of God, act of governmental authority, act of public enemy, war, riot, flood, civil commotion, insurrection, severe weather conditions, or any other cause beyond the reasonable control of the party delayed.

22. Notices. Any notice or other communication required hereunder shall be made in writing and addressed to the parties at their addresses set forth above.

23. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories. A faxed signature shall have the same legally binding effect as an original signature.

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date set forth above.

| ChoicePoint Precision Marketing, Inc. | Licensee |
|---|---|
| BY: *[signature]* | BY: *[signature]* |
| Name: GENE OSMENT | Name: DAVID W. LINHARDT |
| Title: AVP-LEGAL | Title: PRESIDENT |

5

## Exhibit A
to the Data License Agreement
between ChoicePoint Direct, Inc. and
Licensee

A. **DESCRIPTION OF DATA/DATA ELEMENTS:**

The Data will consist of an initial Data delivery of approximately 40,000,000 records, and any Data updates (the "Data Updates") delivered hereunder, which records shall include the following database elements: (a) first and last name; (b) postal address (c) email address (d) domain name where permission from the individual was obtained (e) date and time where available when the individual provided permission; (f) CP unique customer ID; and g) use code.

CP will make a best effort to provide weekly Data Updates throughout the Term hereof.

B. **TYPE OF MEDIA AND FORMAT/DELIVERY OF THE DATA:**

Media: CD-ROM or via FTP Site
Format: Comma Separated Variable (".CSV")

The Data will be delivered within ten (10) business days of the Effective Date hereof.

C. **PERMITTED USES OF DATA AND LICENSE GRANT:**

The following shall be considered permitted uses of the Data, and collectively shall be known as the "Direct Marketing Services," as that term is defined herein:

<u>Email prospecting.</u> Licensee may use the Data to prospect on behalf of itself and its clients, subject to the restrictions contained herein. Licensee or Licensee's approved third-party vendor, subject to the restrictions set forth in paragraph 5 of the Agreement, will execute all email communications related to any such email prospecting. Except as otherwise approved by CP in writing, the transfer or conveyance of CP email addresses to any third-party is expressly prohibited. Data records approved for use in Email prospecting shall be coded "I."

<u>Email address append to Licensee's customers' databases.</u> Licensee may use the Data to append CP email addresses from the Data to Licensee's customers' records, using as matching criteria, first and last name, and physical address. Reverse appending shall also be considered a permitted use hereunder. The appending of CP email addresses, or reverse appending, allowed hereunder is expressly limited to the housefiles or customer lists of Licensee's customers, pursuant to and in accordance with the current guidelines established and maintained by the Direct Marketing Association (the "DMA"). Data records approved for this use shall be coded "I."

<u>Direct Mail.</u> Licensee may use the Data in connection with direct mail campaigns pursuant to the guidelines, standards and suppression files established and maintained by the DMA. Data records approved for this use shall be coded "T" and "O."

Licensee will not use the Data to create any CD-ROM product or any other product or service.

6

Any other uses of the Data not specifically permitted by this Agreement must be mutually agreed upon in writing by both parties.

D. **LICENSE FEES:**

**Revenue Share Payment.** E360 agrees to pay CP its CP Share, as determined below, and it shall do so in United States Dollars not later than thirty (30) days after the end of the month in which E360 collected the CP Data Revenue. The CP Revenue Share shall be based upon the following definitions:

"Data Usage Fees" means the fees collected by E360 from E360 Customers that are directly attributable to the use of the CP Data used in providing Direct Marketing Services.

"CP Data Revenue" means total Data Usage Fees collected by E360 in a given calendar month less: (a) any third-party agency and/or broker fees in connection with any Direct Marketing Service provided hereunder; and (b) actual third-party email delivery fees, provided that such third-party delivery fees do not exceed 25% of Data Usage Fees in connection with any Direct Marketing Service provided hereunder. "CP Revenue Share" means fifty percent (50%) of the CP Data Revenue.

**Payment.** Payment shall be made by check mailed to ChoicePoint Precision Marketing, Inc., ATTN: Accounts Receivable, 3801 Woodland Heights Road, Suite 200, Little Rock, AR 72212. In the event any payment due hereunder becomes more than thirty (30) days past due, then on the thirty-first day, a monthly late penalty fee of one and one-half percent (1.5%) will apply retroactively to said thirty (30) day period and continue until such past due payment, including principal and penalty, are paid in full.

E. **ADDITIONAL TERMS AND CONDITIONS:**

**Data Usage.** For the term of this Agreement, Licensee will receive the right to contact each record from the Data a maximum of ten (10) times per week.

**Access to Records.** Subject to an obligation of Confidentiality as provided in Section 10, and in accordance with E360's security procedures, E360 agrees to provide CP with reports or access to records in the manner and method determined by E360 to monitor and manage information relating to the calculation of CP Revenue. E360 agrees to provide such reports or access to records showing estimated revenues and average revenue per unit earned by CP on a monthly basis not later than the 15th of each month with respect to the prior month hereunder. In addition, E360 will provide a revenue forecast not later than the 1st day of each month.

**Reporting.** Licensee agrees to provide any and all reasonable reporting requested by CP, pertaining to monthly revenue forecasts, Data Usage, the CP Revenue Share, Gross Revenue, the number of responses and new acquisitions as a result of the email marketing campaigns executed hereunder. Revenue forecast reporting shall be due not later than the 1st day of each month hereunder. All other reporting, including the CP Revenue Share and Gross Revenues earned, shall be due not later than the fifteen (15th) of each month with respect to the prior month hereunder.

**Segmentation and Selection.** CP agrees that E360 shall be permitted to segment the list of CP Members according to responsiveness or any other reasonable segmentation criteria, including the ability to segment by source. E360 shall have the right to market CP Data, at its sole discretion, only to those segments it chooses.

7

CP agrees that E360 shall be permitted to select the names and source of names it shall use, and that such 'selection criteria' will determine whether CP will be entitled to Revenue Share Payment for use of any of such names (defined in Section D of Exhibit A). Such criteria may include, without limitation, such factors as the availability of specific demographic, interest and geographic information within CP Data or Non-CP Data; the performance of CP Data and Non-CP Data in previous uses of data; the source and origin date of the CP Data or Non-CP Data; the date of receipt of CP Members or Non-CP Members; and any other criteria which E360 deems appropriate. CP will only generate CP List Revenue when E360 selects and directly uses CP Data in the Direct Marketing Services.

CP agrees that nothing in this Agreement shall be construed to restrict E360's right to use Non-CP Data at any time and without any obligation to pay CP any CP Revenue Share for such use, even if such data is similar or identical to CP Data.

**Limited Service Mark License/Private Labeling of the Data.** CP herein grants Licensee a limited, non-transferable license to use the "itsImazing network" service mark (the "Mark") solely in connection with an introductory email or "permission pass" to the consumers contained within the Data, introducing the consumers to Licensee's private brand or label, and providing the consumers contained within the Data a clear and concise opportunity to unsubscribe from receiving future email marketing messages from Licensee's brand. All email prospecting messages delivered by Licensee to the Data following the permission pass shall originate from a brand or mark owned or properly licensed by Licensee. The license to use the Mark is limited to inclusion of the Mark in the body of the permission pass only, and shall not extend to continued use of the Mark in email prospecting messages thereafter. Within five (5) business days of the Effective Date hereof, CP shall furnish Licensee with acceptable language for inclusion in all such permission pass email messages, which language shall reference the Mark, and Licensee agrees that it shall use only such language in the form and as provided by CP, unless otherwise agreed to in writing by CP. Licensee further acknowledges and agrees that the License is limited to use in connection with "T" records only and shall not extend to the use of the Mark in connection with any other records provided by CP hereunder, including without limitation, Data records coded "O." Except as otherwise provided herein, CP expressly prohibits the use of any brands, service marks, trademarks, trade names, or any other proprietary or identifying marks owned by CP in connection with Licensee's use of the Data hereunder.



**Legal Department**

September 10, 2008

<u>Via Email and Facsimile</u>
<u>(312) 454-0261</u>

Joseph L. Kish, Esq.
Synergy Law Group, L.L.C.
730 W. Randolph Street
Suite 600
Chicago, Illinois 60661

re:   e360Insight's request for indemnification

Dear Mr. Kish,

I am in receipt of your letter to Michael Perrett dated August 28, 2008 in which you demand that ChoicePoint Precision Marketing Inc. ("ChoicePoint") fully indemnify your client, e360Insight ("e360") for certain settlement amounts and attorneys' fees incurred to defend and/or settle three separate lawsuits: *William Silverstein v. e360Insight, LLC et al, John W. Ferron v. e360Insight, LLC et al* and *Mark Ferguson, d/b/a Whew.com v. e360Insight, LLC et al*. For the reasons set forth herein, ChoicePoint must deny the demand made.

First, with respect to the *Silverstein* matter, Section 14 of the Data License Agreement by and between ChoicePoint Precision Marketing Inc. (now, ChoicePoint Precision Marketing LLC) and e360Insight, LLC dated May 28, 2003 ("Agreement"), e360 was required to provide ChoicePoint with "prompt written notice" of any third party claim of which it had knowledge allegedly arising out of ChoicePoint's failure to perform under the Agreement. Your client knew of Mr. Silverstein's claim before April 30, 2007. Notwithstanding such knowledge, e360 did not send its first notice of a "potential breach" and "third-party indemnity issue" to ChoicePoint until November 16, 2007, at which time a letter was sent to Carol DiBattiste. By the time such notice was given, e360 had already filed an Answer to a First Amended Complaint, had participated in the filing of a Motion to Dismiss the First Amended Complaint, as well as particular claims, and had participated in the filing of a Motion to Strike Plaintiff's Request for Punitive Damages. Based on the occurrence of such activity, e360's notice with respect to the *Silverstein* litigation was anything but "prompt". For this reason, ChoicePoint's indemnification obligation with respect to this claim (if any existed) was waived.

Second, my review of the pleadings filed to date in the *Silverstein* matter reveals that the crux of Plaintiff's complaint is that e360 engaged in a "pattern and practice of sending spam" that "contained or was accompanied by falsified, misrepresented, or forged header

**EXHIBIT B**

information" and that the "headers misrepresented and hid the true identity of the sender of the complained of spam", that the spam "failed to contain the sender's physical postal address" and that e360 committed these acts with "oppression, fraud, and malice, in conscious disregard of the rights of Plaintiff". *See, Plaintiff's First Amended Verified Complaint, paragraph 84, 92, and 107*. ChoicePoint has no duty to indemnify e360 for these activities. Such statutory violations, if they occurred, were committed solely and exclusively by e360 with no involvement by ChoicePoint.

Additionally, even if e360 had made its indemnification claim in a timely manner, ChoicePoint is not obligated to indemnify e360 for any costs associated with the filing and prosecution of the Counterclaim of e360 against Silverstein alleging defamation and abuse of process, the response to Plaintiff's Special Motion to Strike under California's anti-SLAPP statute addressing the Counterclaim or the award of attorney's fees and costs to Plaintiff under the anti-SLAPP statute. The indemnification obligation attaches with respect to any alleged ChoicePoint breach. It does not attach to counterclaims made by e360 against any third party.

With respect to the *Ferron* case, it appears that much of Plaintiff's complaint involves e360: (1) using the word "free" in a consumer transaction in a manner that violates the Ohio Consumer Sales Practices Act; (2) making representations that would create in the mind of a reasonable consumer, a false impression as to the grade, quality, quantity, make, model, year, prince, value, size, color, utility, origin or any other material aspect of the offered goods or services in such a manner that, upon subsequent disclosure or discovery of the facts, the consumer may be induced to purchase goods or services other than those offered; (3) failing to register with the Ohio Secretary of State prior to doing business in Ohio; (4) sending email from a supplier that has failed to register a fictitious business name with the Ohio Secretary of State prior to doing business in Ohio under such fictitious name;(5) falsifying email header information; and (6) sending multiple email messages from a combination of more than two different domains names where, in registering such domain names, the supplier uses information that materially falsifies the identity of the actual registrant of the domain names. As with *Silverstein*, these statutory violation, if they occurred, were committed solely and exclusively by e360 with no participation by ChoicePoint. Thus, indemnification is not warranted.

With respect to the *Ferguson* matter, the Complaint similarly alleges that e360 sent the plaintiff emails: (1) that intentionally misrepresent and/or obscure any and all information that could be used in identifying the point of origin or the transmission path thereof; (2) that contain header information that is materially false or materially misleading; (3) that fail to adequately identify the emails as a commercial solicitation; (4) that fail to include a valid physical address in the body of the email or that contain multiple addresses none of which identify the sender clearly and or conspicuously; (5) that contain falsely registered or cloaked domains; (6) from domains that were registered together with multiple other domains at the same time; and (7) that fail to accurately identify the actual sender of the email in the "from" name line and/or "return path" and/or body of the email, and/or were sent to and received at the recipient addresses subsequent to notice provided to

2

defendants to cease and desist sending unsolicited, unwanted, unlawful, and harassing email. Again, as with the prior discussed cases, the actions complained of having nothing to do with ChoicePoint and its provision of email addresses to your client. Therefore, indemnification is not warranted.

Finally, David Linhardt's letter to Carol DiBattiste of November 16, 2007 lists six different email addresses that he believes belong to the plaintiffs involved in the above-mentioned lawsuits. Our records reflect that with respect to four of those email addresses, we would have provided your client an "Optin Status" of "O" when delivering such records. The Agreement between your client and ChoicePoint states that records containing a status of "O" are approved for direct mail and not for email. ChoicePoint should not be held responsible for your client's disregard of this status indicator. The other two email addresses were reflected as available for email distribution until November of 2007 when we learned about the complaint. To our knowledge, the email addresses were not previously the request of an opt-out request.

With respect to the email addresses listed in paragraph 9 of the *Ferguson* Complaint, one of them was provided to your client in approximately Q4 2006. Subsequently, the consumer opted out in Q1 2007, at which time my client would have sent a file containing such information to your client. The other two email addresses do not even exist on our database.

In sum, based on the above, ChoicePoint must refuse e360's demand for indemnification. If you believe that I have misinterpreted the claims at issue, I am happy to discuss them with you. You can reach me at (770) 752-5747.

Very truly yours,

*Meredith Sidewater*

Meredith L. Sidewater
Vice President and Deputy General Counsel

3